**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

**PATSY ANN SMITH,**

      **Plaintiff,**

v.                               **Case No.: 1:14-cv-29870**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently before the Court are (1) Plaintiff's Motion for Summary Judgment, wherein she requests that the Commissioner's decision be reversed and benefits be awarded to her, or in the alternative, that the case be remanded for further proceedings; and (2) the Commissioner's Brief in Support of Defendant's Decision, requesting affirmation of her administrative decision. (ECF Nos. 10, 12).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED**; that the Commissioner's motion for judgment on the pleadings be **GRANTED**; that the decision of the Commissioner be **AFFIRMED**; and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.  <u>Procedural History</u>

On July 26, 2011, Plaintiff Patsy Ann Smith ("Claimant") completed applications for DIB and SSI alleging a disability onset date of July 1, 2011, (Tr. at 153-166), due to "cataracts, capal [*sic*] tunnel in both hands; high blood pressure; anxiety; obesity; tenderness in elbows, left knee; potential diabetes; high cholesterol." (Tr. at 182). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 18). Claimant filed a request for an administrative hearing, which was held on July 16, 2013, before the Honorable Geraldine H. Page, Administrative Law Judge ("ALJ"). (Tr. at 35-62). By written decision dated August 19, 2013, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 18-29). The ALJ's decision became the final decision of the Commissioner on October 14, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6).

Claimant timely filed the present civil action seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Claimant then filed a Motion for Summary Judgment and supporting memorandum, (ECF Nos. 10, 11), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 12). Consequently, the matter is fully

briefed and ready for resolution.

II.     **Claimant's Background**

Claimant was 58 years old at the time that she filed the applications for DIB and SSI, and 60 years old on the date of the ALJ's decision. (Tr. at 38, 153). She obtained a General Equivalency Diploma ("GED"), became certified as a Nursing Assistant ("CNA"), and enrolled in a training program to become an office assistant. (Tr. at 183). Claimant primarily communicates in English. (Tr. at 181). She has previously worked as a CNA, a home health aide, a homemaker in an assisted living facility, and a receptionist in a senior volunteer program. (Tr. at 183).

III.    **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is

whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§

404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents her findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured

status for disability insurance benefits through December 31, 2015. (Tr. at 20, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since July 1, 2011, the alleged disability onset date. (Tr. at 20, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "history of carpel [*sic*] tunnel syndrome; degenerative changes in the lumbar spine; and obesity." (Tr. at 21-23, Finding No. 3). The ALJ considered Claimant's other alleged impairments, but found that those impairments were non-severe. (Tr. at 21-23). In particular, the ALJ assessed Claimant's alleged mental impairments of depression and anxiety under the four broad functional categories set out in the Social Security regulations and concluded that these impairments resulted in only mild limitations with no episodes of decompensation. (Tr. at 23).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 24, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform a range of medium work as defined in 20 C.F.R. 404.1567(c) and 416.967(c). Specifically, the claimant can lift and/or carry 50 pounds occasionally and 25 pounds frequently; can stand and/or walk for no more than 6 hours in an 8-hour workday; and can sit for no more than 6 hours in an 8-hour workday. She can occasionally crawl; can frequently climb ramps and stairs, balance, kneel, stoop, and crouch; and can frequently handle, feel, and finger. The claimant should avoid concentrated exposure to hazardous machinery, unprotected heights, vibrating surfaces, and climbing ladders, ropes, and scaffolds.

(Tr. at 24-28, Finding No. 5). At the fourth step, the ALJ determined that Claimant was able to perform past relevant work as a companion and a receptionist. (Tr. at 28-29 Finding No. 6). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 29, Finding No. 7).

**IV.**   **Claimant's Challenges to the Commissioner's Decision**

Claimant raises two challenges to the Commissioner's decision. First, Claimant argues that the ALJ erred in the weight she gave to the opinions of Dr. William Bird, Claimant's treating physician. (ECF No. 11 at 9-12). Dr. Bird prepared two physical RFC assessments that included substantial limitations in Claimant's ability to walk, stand, sit, lift, carry, bend, stoop, crouch, and squat. Dr. Bird also felt that Claimant's medical conditions would likely cause her to miss one day or more of work per month. Claimant alleges that notwithstanding Dr. Bird's five-year treatment relationship with Claimant, the ALJ rejected Dr. Bird's opinions *in toto* and provided only vague, unsupported reasons for doing so. (*Id*).

Second, Claimant contends that the ALJ failed to properly assess the impact of Claimant's mental impairments on her ability to function. (Tr. at 12-16). In Claimant's view, the ALJ's error began at step two of the disability process when she determined that Claimant's mental impairments were non-severe. Claimant refers to treatment records that purportedly show her mental impairments to result in "a greater than a slight abnormality with greater than minimal effect on the ability to work." (Tr. at 13). Claimant further asserts that a consultative evaluation by Tonya McFadden, Ph.D., corroborated Claimant's allegations of severe mental impairments. According to Claimant, the ALJ rejected Dr. McFadden's findings and, once again, provided only vague and inadequate reasons for doing so. (Tr. at 14-15). Claimant also argues that even if the ALJ was correct in finding her mental impairments to be non-severe, the ALJ still should have considered them in assessing Claimant's RFC. (Tr. at 16). However, the ALJ did not appear to consider them and did not include any limitation in the RFC finding designed to address Claimant's mental impairments. Claimant asks that the Commissioner's decision be

reversed and that she be awarded benefits, or in the alternative, that the case be remanded for further proceedings.

In response, the Commissioner maintains that the ALJ reached the correct decision. She disagrees with Claimant's contention that the ALJ failed to provide good reasons for rejecting the opinions of Dr. Bird and Dr. McFadden. (ECF No. 12 at 11). In addition, the Commissioner argues that Claimant is not credible. Given that the opinions of Dr. Bird and Dr. McFadden were based largely upon Claimant's self-reported symptoms, the opinions were not reliable and were properly rejected. The Commissioner asserts that the ALJ fully considered Claimant's severe and non-severe impairments in determining her RFC; accordingly, Claimant's challenges are without merit.

## V.  <u>Relevant Medical Evidence</u>

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The relevant medical information is summarized as follows.

### A. Treatment Records

### 1.  *William C. Bird, M.D. (Bluestone Health Association)*

On February 26, 2013, Claimant presented to Dr. William Bird at Bluestone Health Association for complaints of a cough and chest congestion. (Tr. at 355-60). Dr. Bird documented Claimant's active medical problems as including anxiety disorder, not otherwise specified; carpal tunnel syndrome; essential hypertension, benign; hyperlipidemia; obesity; osteoarthritis; family history of heart disease; and Vitamins B-12 and D deficiencies. (Tr. at 355). Dr. Bird questioned Claimant about her chronic conditions, and she advised that her mood and anxiety were "doing good," and she was having no problems with hypertension or carpal tunnel syndrome. However, she had not

8

been able to tolerate the medication for hyperlipidemia. Claimant had no complaints except for her cold-like symptoms. (Tr. at 356-57). On physical examination, Claimant was found to weigh 209 pounds and stand 5 feet 1 inch. (Tr. at 357). Her general appearance, head, neck, eyes, ears, lungs, heart, back, abdomen, skin, musculoskeletal system, and neurological system were all normal. (Tr. at 357-58). Dr. Bird ordered some routine laboratory tests and gave Claimant a dose of Vitamin B-12 and a flu vaccination. He renewed her medications and told her to return in three months. (Tr. at 359-60). Claimant returned to Dr. Bird's office for a routine follow-up on May 28, 2013. (Tr. at 363-66). She had no new symptoms and no particular complaints. Dr. Bird's diagnoses remained the same, as did the treatment plan.

Claimant next to presented to Dr. Bird on August 20, 2013. (Tr. at 416-20). The primary issue at this visit was Claimant's habit of taking only a portion of her prescribed hypertension medication. Nevertheless, she reported that her blood pressure was mostly under control. She added that her other medications were performing well, and she had no complaints. (Tr. at 416). She continued to experience anxiety and was taking Ambien to help her sleep. Claimant's physical examination was normal, her chronic conditions remained the same, and her prescriptions were not changed, except for her hypertension medication. She was told to return in three months. (Tr. at 420).

On November 13, 2013, Claimant returned for routine follow-up. (Tr. at 411-15). She reported that she had been trying to get disability, but had been turned down, which increased her anxiety. (Tr. at 411). She also complained that her right lower leg had been bothering her although she did not recall any precipitating injury. Claimant confirmed that she was tolerating her medications, and they seemed to be working quite well. She had no other complaints, except for sleep disturbance. Her chronic conditions remained

the same. (Tr. at 411-13). On examination, Claimant was noted to be obese, but all body systems were normal. Dr. Bird ordered routine laboratory tests, continued her medications, and told her to return in three months. (Tr. at 414-15).

### 2. *Southern Highlands Community Mental Health Center*

On March 28, 2012, Claimant presented to the Southern Highlands Community Mental Health Center ("SHCMHC") for a clinical evaluation at the suggestion of her attorney. (Tr. at 318-22). She reported that anxiety was her primary mental health symptom. (Tr. at 319). Claimant was divorced at the time and working part-time at a government training program. She indicated that her anxiety had started twenty years earlier, although her current symptoms were due to financial concerns, health problems, and situational issues. Claimant stated that her financial situation caused her to feel helpless and hopeless. She also had problems concentrating and felt paranoid. Claimant identified Dr. Bird as her primary health care provider and confirmed that she had no history of inpatient or outpatient psychiatric care. She reported that Dr. Bird prescribed Xanax for her anxiety, and it effectively reduced her symptoms with no side effects. (*Id.*). Claimant provided history regarding her childhood, her marriages, and her past employment. (Tr. at 320). She indicated that she had two adult children and her son, aged 41, currently lived with her. She described having a good relationship with her children.

The interviewers, Sheila Justus, B.A., and Tina Bonich, M.A., performed a mental status examination of Claimant. (*Id.*). Claimant was alert, oriented, and cooperative. Her mood and affect were good; her thoughts were coherent and logical; her insight and judgment were fair; and her self-concept was good. Claimant's sociability was within normal limits, but her coping skills appeared overwhelmed. She reported having problems with her short term memory. Claimant was assessed with general anxiety

10

disorder and given a Global Assessment of Functioning score of 60.[1] Claimant was found to have no limitations in socialization, and she denied daily functional limitations. (Tr. at 321). With respect to Claimant's treatment needs, the interviewers recommended that Claimant continue with her medication and see a counselor. (*Id.*).

Claimant returned to SHCMHC on April 27, 2012 and saw Ted Webb, certified physician's assistant. (Tr. at 323-26). Claimant stated that the purpose of her visit was to determine her need for medication. (Tr. at 323). According to Claimant, she had been seeing Dr. Bird who prescribed Xanax for her anxiety; however, her disability attorney suggested she see a mental health specialist. She reported that she was not depressed, but was quite anxious and felt she was unable to maintain a job. She denied any psychiatric history. Claimant's mental status examination revealed normal psychomotor activity, upbeat mood and broad affect, normal speech, rational thought content, intact memory, and normal attention and sociability. (Tr. at 325). Claimant was found to have average intelligence, with intact insight and judgment. (Tr. at 326). Mr. Webb diagnosed Claimant with depressive disorder, not otherwise specified, and generalized anxiety disorder. Her GAF score was 50.[2] Mr. Webb felt Claimant's prognosis was fair and he added Celexa to her medication regimen. (*Id.*).

---

[1] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Am. Psych. Assoc., 32 (4th ed. text rev. 2000) ("DSM–IV"). On the GAF scale, a higher score correlates with a less severe impairment. The GAF scale was abandoned as a measurement tool in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders*, (5th ed. 2013) ("DSM–5"), in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM–5 at 16. A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM–IV at 34.

[2] A GAF of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). On the GAF scale, a higher score indicates a less severe impairment. DSM-IV at 32.

On May 25, 2012, Claimant was seen again at SHCMHC. (Tr. at 327). She reported doing well. Her diagnoses remained the same, but her Celexa was desisted. (*Id.*). At a follow-up visit on July 19, 2012, Claimant indicated that she was not depressed, but she did have mood swings. (Tr. at 328). Both her diagnoses and treatment plan remained the same. (*Id.*). At her follow-up on October 11, 2012, Claimant again complained of anxiety and sleep disturbance. (Tr. at 371). Except for displaying an anxious mood, Claimant's mental status examination was normal. Her visit on January 10, 2013 was essentially the same. (Tr. at 372).

On April 4, 2013, Claimant presented to SHCMHC and was evaluated by Ira Webb, Jr., M.D., for medication management. (Tr. at 373). Claimant complained of more anxiety, sleeplessness, and depression. Claimant was educated about her medications, their risks, benefits, alternatives, and side effects, and she was told to return in four weeks. (Tr. at 374). She returned as instructed and advised Dr. Webb that she could not tolerate the trazodone prescribed for depression, but she felt she was doing alright without it. (Tr. at 375). She was prescribed Ambien to help with sleep and told to return in four weeks. (Tr. at 376). By May 31, 2013, Claimant reported that her sleep had greatly improved with Ambien. (Tr. at 377). Claimant's mental status examination was within normal limits, and she was told to return in twelve weeks. (Tr. at 377-78).

On that same day, Claimant met with Maynard Peyton for an update of her adult intake information. (Tr. at 379-82). She reported that she was currently taking Xanax and Ambien. She felt she was functioning better, with less anxiety and more community involvement. (Tr. at 380). She indicated that she did not need counseling. Claimant's affect was noted to be anxious, and she had some problems with daily functioning related to interpersonal and family relationships, but had begun to socialize more and was less

anxious around people. (Tr. at 381). Claimant was categorized as a patient needing "low end services;" essentially medication management only. She was diagnosed with generalized anxiety disorder and was given a GAF score of 60. (Tr. at 383).

### B. Evaluations and Opinions

On September 22, 2011, Dr. Gary Craft performed a physical assessment of Claimant at the request of the SSA. (Tr. at 248-53). He took a report of Claimant's symptoms, which included small cataracts in both eyes; pain and tingling in her hands, tenderness in her elbows, and pain in the left knee; hypertension; elevated cholesterol and borderline diabetes; obesity; and anxiety and depression. (Tr. at 248-49). On examination, Claimant appeared physically healthy, fully ambulatory, and in no acute distress. (Tr. at 249). Her weight was 215 pounds and her blood pressure was elevated. Her visual acuity with correction was 20/40 and 20/25. Claimant's musculoskeletal examination was entirely normal. Her neurological evaluation confirmed that her ability to squat was "fair;" she could toe and heel walk; her gait and station were normal; reflexes, muscle tone and strength were normal, and sensation was intact. (Tr. at 250). Despite her history of carpal tunnel syndrome and complaints regarding pain and tingling, Claimant's fine and gross manipulation were likewise intact. She also had "excellent motor power and grip strength in each upper extremity and was free of any joint abnormalities." (*Id.*). Dr. Craft noted that Claimant seemed to function well, even with her added weight. He saw no signs of any mechanical limitations, undue fatigue, or shortness of breath related to her obesity. As far as Claimant's psychological complaints, Dr. Craft could not detect any abnormality or sign of deterioration due to anxiety/depression. (Tr. at 251).

On September 26, 2011, Fulvio Franyutti, M.D., completed a Physical Residual Functional Capacity Assessment based upon Dr. Craft's examination. (Tr. at 267-74). Dr.

Franyutti noted that Claimant's alleged impairments included history of carpal tunnel syndrome, status post release surgery, and small cataracts in both eyes. (Tr. at 267). As to exertional limitations, Dr. Franyutti determined that Claimant could occasionally lift fifty pounds; frequently lift twenty-five pounds;, and stand, walk, or sit (each) six hours in an eight-hour workday. (Tr. at 268). Claimant was unlimited in her ability to push and pull. (*Id.*) With respect to postural limitations, Dr. Franyutti found that Claimant could occasionally climb ladders, ropes, or scaffolds and crawl; and frequently climb ramps and stairs, balance, stoop, kneel, and crouch. (Tr. at 269). Dr. Franyutti opined that Claimant had not established any manipulative, visual, or communicative limitations. (Tr. at 270-71). As for environmental limitations, Claimant could have unlimited exposure to wetness, humidity, noise, vibration, fumes, odors, dusts, and gases; however, Dr. Franyutti believed that Claimant should avoid concentrated exposure to extreme cold or heat and  hazards, such as machinery or heights. (Tr. at 271). Dr. Franyutti opined that Claimant was partially credible. (Tr. at 274).

On October 10, 2011, Kelly Robinson, M.A. performed a psychological evaluation of Claimant at the request of the SSA. (Tr. at 290-95). Ms. Robison noted that Claimant was 5 feet 2 inches tall and weighed 220 pounds. She walked with a normal gait, had normal posture, and was able to use all of her limbs well. (Tr. at 290). Claimant reported that her psychological symptoms included feelings of nervousness, problems with concentration, racing thoughts, and sleep difficulties. She also felt irritable and withdrew from other people. She indicated that she had experienced these symptoms for twenty years, and they had varied over time. (*Id.*). According to Claimant, Xanax helped reduce her racing thoughts. As far as her sleep difficulties, Claimant stated that she had trouble falling to sleep and awoke several times through the night, generally only getting three to

14

four hours of sleep each night. (Tr. at 291).

Claimant was questioned about her substance abuse history and mental health treatment history, both of which were nonexistent. She had no difficulties in school, earned a GED, and received additional training as a CNA. Claimant was currently working part-time as a receptionist. Claimant's mental status examination was essentially normal, except for an anxious mood. (Tr. at 292). Ms. Robinson diagnosed Claimant with anxiety disorder, not otherwise specified. She felt Claimant's concentration, social functioning, persistence, and pace were all within normal limits. (Tr. at 293-94). Ms. Robinson documented Claimant's self-reported activities as including working at an office twenty hours per week; performing household chores; doing the laundry; grocery shopping; cooking; talking with her daughter on the telephone; feeding her cat; reading; and watching television. (Tr. at 293).

On October 11, 2011, Debra Lilly, Ph.D., completed a Psychiatric Review Technique based upon her review Claimant's file and Ms. Robinson's evaluation. (Tr. at 275-88). Dr. Lilly determined that Claimant had an anxiety-related disorder, but her impairment was not severe. (Tr. at 275). She opined that Claimant had mild limitations in activities of daily living, maintaining social functioning, and maintaining persistence, pace, and concentration. (Tr. at 285). Claimant had no episodes of decompensation of extended duration. In addition, Dr. Lilly found no evidence of paragraph C criteria. (Tr. at 286). Dr. Lilly felt that Claimant was credible, but she did not have any functional deficits related to a mental disorder.

On February 17, 2012, Thomas Lauderman, D.O., completed a Physical Residual Functional Capacity Assessment based upon a review of Claimant's records. (Tr. at 296-303). He opined that Claimant could occasionally lift fifty pounds; frequently lift twenty-

five pounds; and stand, walk, or sit (each) six hours in an eight-hour workday. (Tr. at 297). Claimant was unlimited in her ability to push and pull. (*Id.*) With respect to postural limitations, Dr. Lauderman found Claimant capable of occasionally climbing ladders, ropes, or scaffolds; and frequently climbing ramps and stairs, balancing, stooping, kneeling, crouching and crawling. (Tr. at 298). He added that Claimant had not established any manipulative, visual, or communicative limitations. (Tr. at 299-300). As for environmental limitations, Claimant could have unlimited exposure to wetness, humidity, noise, vibration, fumes, odors, dusts, and gases; however, she should avoid concentrated exposure to extreme cold or heat and hazards, such as machinery or heights. (Tr. at 300). Dr. Lauderman assessed Claimant as being only partially credible. (Tr. at 303).

A Psychiatric Review Technique was completed by Rosemary Smith, Psy.D., on February 20, 2012. (Tr. at 304-17). She concluded that Claimant had an anxiety-related disorder, but did not believe that it was a severe impairment. (Tr. at 304). Dr. Smith found Claimant to have mild limitations in activities of daily living, maintaining social functioning, and maintaining persistence, pace, and concentration. (Tr. at 314). There was no history of episodes of decompensation of extended duration, and no evidence of paragraph C criteria. (Tr. at 314-15). Dr. Smith did not find Claimant to be entirely credible, indicating that the record did not demonstrate any significant functional limitations due to a mental impairment. (Tr. at 316).

On September 25, 2012, Dr. Bird completed a Physical Residual Functional Capacity Questionnaire at the request of Claimant's attorney. (Tr. at 331-35). Dr. Bird noted that Claimant had been his patient for five years and visited every three to six months. (Tr. at 331). Her diagnoses were anxiety, carpal tunnel syndrome, hypertension,

hyperlipidemia, degenerative joint disease, and Vitamin D deficiency. Claimant's prognosis was good. As far as symptoms, Claimant had anxiousness, some social anxiety, insomnia, and fatigue. Objectively, she displayed an anxious mood, was easily distracted, and was overweight. Dr. Bird stated that he prescribed Xanax for Claimant, which seemed to control her symptoms and help her sleep. (*Id.*). Dr. Bird did not believe Claimant was a malingerer and felt that her emotional factors contributed to her functional limitations. (Tr. at 332). He opined that Claimant's symptoms were severe enough to interfere frequently with attention and concentration. He felt working would make her more anxious and distracted.

With respect to specific functional limitations, Dr. Bird opined that Claimant had no limitation on her ability to walk city blocks without resting, and she could sit more than two hours without needing to get up. However, Dr. Bird felt that Claimant could only stand thirty minutes before having to sit down. (*Id.*). In an eight-hour day, Claimant could stand/walk less than two hours and sit about two hours. Dr. Bird noted that Claimant would need to walk every thirty minutes for around two minutes and would need a work position that would allow her to shift at will from sitting, standing, and walking. (Tr. at 333). He added that Claimant would need to take ten minute breaks every two hours. Dr. Bird opined that Claimant could never lift and carry twenty pounds or more and could only rarely lift and carry ten pounds or less. He felt she should only rarely look up or down, occasionally hold her head in a static position, and could frequently turn her head left or right. (Tr. at 334). He did not think Claimant had any limitations in reaching, handling, or fingering. However, he opined that Claimant would have "good days" and "bad days" causing her to be absent from work about one day per month. (*Id.*).

On April 15, 2013, Tonya McFadden, Ph.D., performed a psychological evaluation of Claimant at the request of the SSA. (Tr. at 340-44). Dr. McFadden indicated that Claimant drove herself to the evaluation and was nicely dressed. She reported having a normal childhood and normal educational history. She had been married twice and had two grown children. Claimant's presenting symptoms included anxiety, irritability, and sleep disturbances. She reported that she currently worked part-time, but her job was going to be phased out and that caused her to worry about her financial future. However, Claimant stated that she did not feel like she was totally disabled from work. (Tr. at 341). Claimant did not appear particularly depressed. She felt that medication for the symptoms of menopause had helped stabilize her mood. (Tr. at 342).

Dr. McFadden conducted a mental status examination of Claimant, finding her to be well-groomed, pleasant, cooperative, and oriented. (Tr. at 343). Claimant appeared mildly anxious and expressed some frustration over the disability process. Claimant's concentration was mildly deficient, but all other findings were within normal limits. Claimant's social functioning was normal. She reported going to the store, making meals, talking with her daughter, caring for her cat, washing clothes, doing housework, reading, and watching television. Claimant stated that she provided private home sitting services twice per week and usually worked twelve hours on those days. Dr. McFadden diagnosed Claimant with anxiety disorder, not otherwise specified. (Tr. at 344).

Dr. McFadden also completed a Medical Source Statement of Ability to do Work-Related Activity (Mental) form. (Tr. at 346-48). Dr. McFadden found that Claimant had no limitations in her ability to understand, remember, and carry out simple instructions; she was mildly limited in her ability to make simple work-related decisions; and moderately limited in her ability to understand, remember, carry out complex

instructions and make complex work-related instructions. (Tr. at 346). In the area of social functioning, Claimant was mildly limited in her ability to interact appropriately with the public and moderately limited in her interactions with supervisors and co-workers. (Tr. at 347). Dr. McFadden found Claimant to be moderately limited in her ability to adjust to changes at work and to respond appropriately to usual work situations.

On November 27, 2013, Dr. Bird prepared a second Physical Residual Functional Capacity Questionnaire at the request of Claimant's attorney. (Tr. at 423-28). This time, Dr. Bird added some symptoms, including chronic pain and tingling in Claimant's hands due to carpal tunnel syndrome, and chronic pain from osteoarthritis in her wrists, hands, hips, knees, ankles, and lower back. (Tr. at 424). He reiterated that Claimant's anxiety interfered with her ability to work, opining that she was incapable of tolerating even "low stress" jobs. (Tr. at 425). Dr. Bird altered his estimate of Claimant's physical limitations somewhat, finding that she could sit no more than two hours at one time without standing up; she could stand only 45 minutes before having to sit or walk, and she needed to walk for ten minutes every 45 minutes. (Tr. at 425-26). He altered his opinion on Claimant's ability to lift and carry objects, indicating that she could frequently carry less than ten pounds and occasionally carry ten pounds. (Tr. at 426). She could move her head occasionally; rarely twist, stoop, and climb stairs; and could never crouch, squat, or climb ladders. Dr. Bird increased the number of days that Claimant would need to be absent from work from one day per month to more than four days per month. (Tr. at 427).

## VI.   **Scope of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v.*

*Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  **Discussion**

Both of Claimant's challenges relate, in whole or in part, to the ALJ's evaluation of the medical source statements. Claimant believes that the ALJ incorrectly rejected the RFC assessments of Dr. Bird and also mistakenly discounted the significance of Dr. McFadden's findings regarding Claimant's moderate psychological limitations. Claimant further complains that the ALJ provided a superficial and vague explanation for her treatment of these medical source statements.  Lastly, Claimant complains that the ALJ failed to take into account Claimant's psychological impairments when assessing her RFC.

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions

are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). Title 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be given to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.*

If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. § 404.1527(c)(2)-(6) and 20 C.F.R. § 416.927(c)(2)-(6),[3] and must explain the reasons for the weight given to the opinions. "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means

---

[3] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4. Nevertheless, a treating physician's opinion may be rejected in whole or in part when there is persuasive contrary evidence in the record.[4] *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays,* 907 F.2d at 1456.

Beginning with Dr. Bird's opinions, the ALJ acknowledged that Dr. Bird was Claimant's primary care physician and believed that Claimant had significant limitations in her ability to do work-related activities. (Tr. at 27). Nonetheless, the ALJ rejected Dr. Bird's opinions based upon the "objective medical records," finding that Dr. Bird's opinions were inconsistent with his treatment of Claimant and with the other evidence of record. In particular, the ALJ pointed to Dr. Bird's office notes, which indicated that Claimant was "doing well." (*Id.*). While this explanation by the ALJ may appear vague and superficial, the explanation must be viewed in association with the remainder of the written decision. Earlier in the decision, the ALJ discussed in greater detail the objective

---

[4] Although 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) provide that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* §§ 404.1527(c)(2), 416.927(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 (stating that when a decision is not fully favorable, "the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). "[W]hile the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W.Va. Sept. 30, 2014).

findings and conclusions documented by Dr. Bird in Claimant's office chart. The ALJ noted that, in February and May 2013, Dr. Bird recorded that Claimant was doing well physically and emotionally. (Tr. at 26). Dr. Bird made no significant findings on physical examination of Claimant, provided no recommended changes to the treatment plan, and made no referral of Claimant to a specialist. In addition to Dr. Bird's notations, the ALJ discussed other medical evidence in the record that confirmed the non-disabling nature of Claimant's symptoms. The ALJ indicated that Claimant had been working at least twenty hours per week and was able to attend to her personal needs, care for her pet, do general household chores, prepare meals, drive, shop, watch television, read, manage her finances, and regularly attend church. (Tr. at 26-27). The ALJ concluded that Claimant's apparent ease in performing a range of daily activities was inconsistent with her claim of disability.

Having rejected Dr. Bird's opinions as being contradictory to the evidence, the ALJ properly examined and weighed the other medical source opinions, including the opinions of Dr. McFadden. (Tr. at 27). The ALJ accepted Dr. McFadden's statement that Claimant had no limitations in understanding, remembering, and carrying out simple work-related instructions, but did not agree with Dr. McFadden that Claimant had moderate limitations in her ability to interact with supervisors and co-workers. According to the ALJ, this opinion was "inconsistent with the other evidence in the record and was inconsistent with Dr. McFadden's own findings on examination." (*Id.*). The ALJ emphasized that Claimant reported feeling happy and denied having excessive worry. Earlier in the decision, the ALJ commented on Claimant's admission to Dr. McFadden that she did not feel totally disabled. Moreover, Dr. McFadden's mental status examination of Claimant was essentially within normal limits. (Tr. at 22). The ALJ also

mentioned that Claimant's treating mental health care providers had concluded that Claimant's ability to socialize was not significantly impaired. In addition, Claimant's mood was often described as upbeat, and she responded well to the medications designed to treat her anxiety and sleep disturbances. (*Id.*). Thus, the ALJ gave good reasons for discounting Dr. McFadden's opinions on social functioning.

The ALJ reviewed the other agency consultants' opinions, commenting that both Dr. Franyutti and Dr. Lauderman thoroughly examined the medical evidence in the record and determined that Claimant could perform a range of medium exertional work, with a few limitations. (Tr. at 27). The ALJ also mentioned the evaluations of Dr. Lilly and Dr. Smith, both of whom found Claimant's mental impairments to be non-severe. The ALJ indicated that although the opinions of non-treating sources were generally entitled to less weight, in this case, the ALJ felt those opinions were more consistent with the evidence as a whole. The ALJ additionally stressed that the agency consultants had access to Claimant's entire file and had a high level of understanding of the Social Security review process. (Tr. at 28).

Having reviewed the evidence and the written decision of the ALJ, the undersigned **FINDS** that the ALJ weighed the medical source opinions in accordance with Social Security rules and regulations. Although the ALJ did not provide a detailed explanation of her reasons for rejecting or discounting the opinions of Dr. Bird and Dr. McFadden, the explanation provided was sufficient when viewing the written decision as a whole. The ALJ made it clear that she rejected those opinions because the level of impairment reflected in them was simply inconsistent with the remainder of the evidence, which lacked indicia of significant limitations. Moreover, the ALJ found the opinions to be discordant with the findings documented by Dr. Bird and Dr. McFadden in the notes

24

reflecting their own examinations of Claimant. As previously stated, an ALJ is not required to blindly accept the opinions of a treating physician. Here, the ALJ acted well within her discretion to give the opinions of Dr. Bird and Dr. McFadden less weight, especially when considering the lack of documentation supporting them. *See Owens v. Colvin,* No. 2:14-CV-17942, 2015 WL 5725828, at *4 (S.D.W.Va. Sept. 30, 2015) (As long as the determination to reject a treating physician's opinion is based on substantial evidence in the record, the ALJ is "within his discretion" to reject the opinion.). The ALJ weighed the medical source opinions and gave good (albeit abbreviated) reasons for rejecting and discounting certain opinions. To the extent that the ALJ could have done a better job of specifying the inconsistent or conflicting evidence that supported her decision, any error was harmless because her rationale is plain, and her decision is supported by substantial evidence. *Emrich v. Colvin*, 90 F. Supp. 3d 480, 488 (M.D.N.C. 2015) ("In social security cases, an ALJ's errors are harmless so long as the ALJ's conclusion is supported by substantial evidence in the record and the claimant could not reasonably have been prejudiced by the error.") (citing *Tanner v. Comm'r of Soc. Sec.,* No. 14–1272, 602 Fed.Appx. 95, 101, 2015 WL 574222, at *5 (4th Cir. Feb. 12, 2015)). "In general, remand of a procedurally deficient decision is not necessary 'absent a showing that the [complainant] has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.'" *Plowden v. Colvin*, No. 1:12-CV-2588-DCN, 2014 WL 37217, at *4 (D.S.C. Jan. 6, 2014) (quoting *Connor v. U.S. Civil Serv. Comm'n,* 721 F.2d 1054, 1056 (6th Cir. 1983)). The burden of showing that the error was prejudicial rests with the party attacking the agency's determination. *Johnson v. Colvin*, No. 2:12-CV-01475-JMC, 2013 WL 5139122, at *3 (D.S.C. Sept. 11, 2013) (citing *Shinseki v. Sanders,* 556 U.S. 396, 409, 129 S.Ct. 1696, 173 L.Ed.2d 532 (2009)); *see, also, Johnson*

*v. Colvin*, No. 2:12-CV-01475-JMC, 2013 WL 5139122, at *3 (D.S.C. Sept. 11, 2013) ("[I]n situations where the harm is not obvious and/or the Commissioner points to overwhelming evidence that supports the ALJ's conclusions despite the error, the court will require the plaintiff to establish prejudice"). Although the ALJ's written discussion of the opinion evidence is not perfect, ensuring perfection is not the aim of the substantial evidence test. *See, e.g., Reynolds v. Colvin*, No. 6:13-cv-22604, 2014 WL 4852242, at *21 (S.D.W.Va. Aug. 19, 2014).

The ALJ aptly pointed out that the proof supplied by Claimant regarding her physical and mental impairments was insufficient to establish the presence of disabling functional limitations. Claimant admitted that her anxiety was, to a great extent, triggered by her concern over financial matters. Once her house and car were paid in full, Claimant stated that her anxiety substantially decreased. (Tr. at 342). She told Dr. McFadden that she "mainly" felt happy, and her mood swings had stabilized since she began taking progesterone for menopausal symptoms. (*Id.*). From a physical standpoint, Claimant had no objective findings sufficiently severe to justify the substantial limitations claimed by Dr. Bird. To the contrary, Claimant was able to perform a range of daily activities with little difficulty, and her examinations revealed few functional deficits. Indeed, even Claimant was skeptical that her impairments were disabling. (Tr. at 341).

With respect to Claimant's criticism that the ALJ failed to fully account for Claimant's mental impairments in the RFC assessment, the undersigned **FINDS** Claimant's arguments to be unpersuasive. Claimant contends that her mental impairments resulted in more than a minimal effect on her ability to function. In support, Claimant relies upon Dr. Bird's opinion that her anxiety interfered with her ability to work. However, the ALJ rejected that opinion because it lacked a solid factual foundation.

Claimant also points out that she has had a longstanding diagnosis of anxiety, which requires her to use psychotropic medication and merited her one GAF score of 50, a sign of serious symptoms. While it is true that Claimant alleged a twenty-year history of anxiety, she was able to work most of those years. Furthermore, Claimant reported that Xanax and progesterone substantially reduced her anxiety and mood swings, and she had no side effects from these medications. Although a physician's assistant once gave Claimant a score of 50 on the GAF scale, the physician's assistant never explained the basis for that score. Certainly, the findings on Claimant's mental status examination did not justify the physician's assistant's conclusion that Claimant had *serious* symptoms. On the day that Claimant's GAF score was assessed at 50, her mental status examination reflected normal psychomotor activity; upbeat mood; broad affect; normal speech; rational thought content; no hallucinations, delusions, suicidal or homicidal thoughts; and intact cognition. Claimant was alert and oriented times three; her memory was intact; her attention and sociability were normal; her insight and judgment were intact; her intelligence appeared to be average level; and she denied somatic symptoms. (Tr. at 325-26). She complained of anxiety and sleep disturbance, but denied being depressed. (Tr. at 323). Despite this denial, the physician's assistant inexplicably listed Claimant's primary diagnosis as depressive disorder, not otherwise specified. Given that there was no discernible basis for that diagnosis or for a GAF score of 50, Claimant is hard-pressed to rely on that assessment. In any event, a GAF score has "no direct legal or medical correlation to the severity requirements of social security regulations." *Powell v. Astrue,* 927 F.Supp.2d 267, 273 (W.D.N.C. 2013) (citing *Oliver v. Comm'r of Soc. Sec.,* 415 Fed.Appx. 681, 684 (6th Cir.2011)). Instead, a GAF score is "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning."

*Id.* (quoting *White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 276 (6th Cir.2009)). In other words, it is merely a "snapshot of functioning at any given moment." *Id. (citing Fowler v. Astrue,* 2011 WL 5974279 **3 (W.D.N.C. 2011)).

 In summary, the record taken as a whole demonstrates very little in the way of functional limitations, either physical or emotional. The ALJ's determination that Claimant had no severe mental impairment was supported by two consultative opinions and by the treatment records. The ALJ's decision not to include specific limitations in the RFC finding related to psychological symptoms is also supported by a lack of evidence indicating functional deficits attributable to psychological distress. Claimant bears the burden of proof and persuasion on the ultimate issue of disability, and she has simply failed to meet her burden. Accordingly, the ALJ correctly decided that Claimant was not disabled under the Social Security Act.

## VIII. Recommendations for Disposition

 Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's Motion for Summary Judgment, (ECF No. 10), **GRANT** Defendant's Motion for Judgment on the Pleadings, (ECF No. 12), and **DISMISS** this action, with prejudice, from the docket of the Court.

 The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this

Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Faber, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  November 24, 2015

Cheryl A. Eifert
United States Magistrate Judge

29